UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

STEPHANIE RAPKIN,

    *Plaintiff,*

    *v.*

                                  Case No: 2:23-cv-670

VILLAGE OF SHOREWOOD,
VILLAGE OF WHITEFISH BAY,
PETER NIMMER, NICHOLAS MUELLER,
IAN KUDRYNSKYY, THOMAS LIEBENTHAL,
HALSTON WOLBER, ALI-RAZA GOVANI,
CODY SMITH, AND JULIA ZURFLUH,

    *Defendants.*

## COMPLAINT

Plaintiff Stephanie Rapkin by her attorneys, Strang Bradley, LLC, for her complaint against Defendants, states:

### INTRODUCTION

1. On June 7th of 2020, while Stephanie Rapkin was sleeping in her bed, members of the Shorewood and Whitefish Bay police departments were outside her home, trying to think of an excuse to enter, so they could arrest her on allegations that she pushed a protestor picketing outside of her home.

2. After spending roughly 40 minutes milling around, the officers conspired to violate the Fourth Amendment by breaking into Rapkin's home under the false pretense that they just wanted to perform a welfare check.

3. The justification for the excuse came from a neighbor, who told them that Rapkin *may have* taken a single sleeping pill twelve hours before.

4. Based on this totally innocuous information, the officers kicked down Rapkin's door, pointed weapons at her, arrested her, dragged her outside, paused to allow a round of applause by a crowd who had gathered around her home to watch the spectacle, and then re-entered her home to desperately search for any evidence they could use to justify their blatant violation of the Constitution.

5. None of the officers who destroyed Rapkin's front door, arrested her in her own home, and then rummaged through her personal belongings ever considered seeking a warrant.

6. Rapkin is an attorney and a member of the Wisconsin bar in good standing, who knew her rights and attempted to assert them to the police.

7. But the conspirators were there to arrest her, and they would not be deterred by anything. Not the locks on her door. Not Rapkin. Not the Constitution.

8. Even the Chief of the Shorewood Police, who was contacted by the officers prior to their unconstitutional actions in this case, did nothing to deter them.

9. This is because the Village of Shorewood police department has a policy of ignoring the Fourth Amendment's warrant requirement by falsely invoking the community caretaker doctrine to break into private citizens' homes.

10. This lawsuit seeks to vindicate the violation of Rapkin's constitutional rights. It is also an attempt to effect change through punitive damages by punishing the

defendants for their total disregard of the Constitution with the hope that the punishment is significant enough to prevent this from happening again in the future.

## JURISDICTION AND VENUE

11. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

12. This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and the state law claims for indemnification pursuant to 28 U.S.C. § 1367.

13. Venue is proper under 28 U.S.C. § 1391(b). Defendants Village of Shorewood and Village of Whitefish Bay are political subdivisions of the state of Wisconsin located within this judicial district. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## PARTIES

14. Plaintiff Stephanie Rapkin is a licensed attorney in good standing with, and a resident of, the State of Wisconsin.

15. Defendant Village of Shorewood is a political subdivision of the State of Wisconsin and was the employer of individual Defendants Peter Nimmer, Nicholas Mueller, Ian Kudrynskyy, Halston Wolber, Thomas Liebenthal, Ali-Raza Govani, and Cody Smith at the time of the occurrences giving rise to this lawsuit and is required to pay any tort judgment for damages for which its employees are liable for acts within the scope of their employment pursuant to WIS. STAT. § 895.46.

16. Defendant Village of Whitefish Bay is a political subdivision of the state of Wisconsin and was the employer of individual Defendant Zurfluh at the time of the

occurrences giving rise to this lawsuit and is required to pay any tort judgment for damages for which its employees are liable for acts within the scope of their employment pursuant to WIS. STAT. § 895.46.

17. Peter Nimmer was, at the time of this occurrence, the Chief of Police for the Village of Shorewood Police Department and was the chief policymaker for the police department. Nimmer engaged in the conduct complained of while he was on duty and in the course and scope of his employment with the Village of Shorewood.

18. Nicholas Mueller was, at the time of this occurrence, employed as an officer with the Village of Shorewood Police Department. Mueller engaged in the conduct complained of while he was on duty and in the course and scope of his employment with the Village of Shorewood.

19. Halston Wolber was, at the time of this occurrence, employed as an officer with the Village of Shorewood Police Department. Wolber engaged in the conduct complained of while he was on duty and in the course and scope of his employment with the Village of Shorewood.

20. Ian Kudrynskyy was at the time of this occurrence, employed as an officer with the Village of Shorewood Police Department. Kudrynskyy engaged in the conduct complained of while he was on duty and in the course and scope of his employment with the Village of Shorewood.

21. Thomas Liebenthal was at the time of this occurrence, employed as an officer with the Village of Shorewood Police Department. Liebenthal engaged in the conduct

complained of while he was on duty and in the course and scope of his employment with the Village of Shorewood.

22. Ali-Raza Govani was at the time of this occurrence, employed as an officer with the Village of Shorewood Police Department. Govani engaged in the conduct complained of while he was on duty and in the course and scope of his employment with the Village of Shorewood.

23. Cody Smith was at the time of this occurrence, employed as an officer with the Village of Shorewood Police Department. Smith engaged in the conduct complained of while he was on duty and in the course and scope of his employment with the Village of Shorewood.

24. Julia Zurfluh was at the time of this occurrence, employed as an officer with the Village of Whitefish Bay Police Department. Zurfluh engaged in the conduct complained of while she was on duty and in the course and scope of her employment with the Village of Whitefish Bay.

## FACTS

25. The interactions between the individual police officers named in this lawsuit and members of Stephanie Rapkin's neighborhood were captured on the officers' body-worn cameras.

26. Govani and Kudrynskyy had already spoken to Rapkin earlier that day, at around 3:41 p.m., and could see that she was perfectly fine.

27. Rapkin spoke to Govani and Kudrynskyy to tell them that her phone was being bombarded with threatening messages from anonymous people.

28. Govani and Kudrynskyy told her they could not help her and advised Rapkin to go inside her home and not open the door if anyone knocked.

29. After Govani and Kudrynskyy left, Rapkin took the officers' advice by turning off her phone, locking her doors, and going to sleep in her home.

30. Later that day, Shorewood police returned to Rapkin's neighborhood to take the statement of a young man in his twenties who wanted to file charges against the sixty-four-year-old Rapkin for pushing him.

31. The young man and his mother came into contact with Rapkin because they were camped outside her home to confront her. Once they saw Rapkin they got in her face, thrusted a recording cell phone at her, and verbally berated her.

32. Rapkin responded by lightly placing her hand on the young man's chest and pushing him away from her.

33. After reviewing the protestor's cell-phone footage, Liebenthal, Mueller, Kudrynskyy, Govani, Wolber, and Smith made the decision that Ms. Rapkin was going to be arrested.

34. Liebenthal, the acting lieutenant on scene, told the protestor's mother that they were there to "hook [Rapkin] up."

35. Hook up is police slang for arresting someone.

36. Liebenthal's intent was clear from the beginning: he called for a female police officer to arrive on the scene, so he could have her be the one to physically put their hands on Rapkin when she was being arrested.

37. Liebenthal, Mueller, Kudrynskyy, Govani, Wolber, and Smith approached Rapkin's home and began to knock on the doors and windows, asking her to come out to speak with them.

38. The officers also attempted to call her cell phone, but the phone went straight to voicemail because Rapkin had turned it off when she went to sleep.

39. When Rapkin didn't respond to the knocks, the officers yanked on the locked doors to her home despite having no warrant, or any valid exception to the warrant requirement, that would have justified opening the doors to look inside.

40. Facing a locked home, Liebenthal, Mueller, Kudrynskyy, Govani, Wolber, and Smith started to conspire to come up with a justification to break into the house to arrest Rapkin. They never considered obtaining a warrant.

41. Even before the conspirators heard a lick of information about Rapkin's well-being, they started to suggest that they could enter the home under the guise of the community caretaker doctrine.

42. This is because the Village of Shorewood Police Department has a practice of fabricating excuses to conduct warrantless home entries instead of simply seeking warrants.

43. This is evidenced by the nearly universal and immediate reaction of the Shorewood defendants when they realized Rapkin wasn't opening her door: that they should enter under the guise of "community caretaker."

44. The officers also jokingly referenced the fact that Smith has a lot of experience kicking down doors for welfare checks.

45. One of the officers was captured on his body-worn camera complaining that he wants more practice kicking down doors because he is afraid he would slip and fall and be embarrassed in front of his colleagues.

46. The conspirators requested that Zurfluh, a member of the Village of Whitefish Bay Police, come as a backup because they wanted a female officer to arrest Rapkin.

47. And, despite their claimed concern for Rapkin's health, not a single officer thought to radio for an ambulance or medical staff until well after Rapkin was arrested and placed in the back of a police cruiser.

48. All the commotion drew a crowd of neighbors and onlookers.

49. Liebenthal took control of the situation and began to search for something he could use to justify a warrantless entry into the home.

50. When asked by the protestor's mother what the police could do if Rapkin didn't come to the door to be arrested, Liebenthal responded that he was "working on it."

51. Liebenthal spoke to a neighbor of Rapkin's, Dr. Simon Dao.

52. Dr. Dao told Liebenthal that he heard from Rapkin that she took a sleeping pill roughly twelve hours before the police arrived on the scene because she was exhausted.

53. Dr. Dao specifically told Liebenthal that he was unaware of Rapkin taking any other medication besides the single sleeping pill she said she took twelve hours ago.

54. Liebenthal asked Dr. Dao if Rapkin had any history of self-harm or suicidal thoughts, and Dr. Dao told him definitively that Rapkin does not.

55. Despite this, Liebenthal wrote a police report where he falsely claimed that Dr. Dao "stated he did not know that information."

56. Liebenthal's police report also contains the false statement that Dr. Dao told him Rapkin had taken multiple doses of sleep medication.

57. Meanwhile, Mueller was talking to another neighbor down the street.

58. This neighbor told Mueller that she had seen Rapkin in her bed shortly before the police arrived and that Rapkin seemed totally fine.

59. Mueller reported this to Liebenthal, telling him that he spoke to a neighbor that had personally observed Rapkin shortly before police arrived, that Rapkin was exhausted but otherwise totally fine, and that Rapkin had not mentioned anything about taking medication.

60. And Govani and Kudrynskyy had spoken to Rapkin earlier and were fully aware that she was totally fine.

61. Liebenthal brushed this off and told Mueller that he was going to order a warrantless entry into Rapkin's home anyways.

62. Then Liebenthal turned off his body camera and had a nine-minute conversation with Nimmer, the acting chief of police.

63. After this conversation with the chief policymaker, the decision was made that the officers were going to enter Rapkin's home without a warrant.

64. Liebenthal ordered Mueller, Kudrynskyy, Govani, Wolber, Smith, and Zurfluh to kick down Rapkin's door to conduct a welfare check.

65. The officers entered the home with guns and tasers drawn, and then standing at the bottom of Rapkin's stairs, ordered her to come down to speak with them.

66. Rapkin, awoken by the violent invasion into her home, told the armed intruders that she had been asleep upstairs.

67. The officers ordered Rapkin to come downstairs so they could "check on her."

68. Rapkin came down the stairs and asked the officers if they had a warrant.

69. The officers responded that they were there to perform a welfare check, and asked Rapkin if she had taken sleeping medication.

70. Rapkin told the police that she was totally fine, that she had not taken any sleeping medication, and that she wanted them to leave so she could go back to sleep.

71. At this point, even for the officers who hadn't spoken directly to Rapkin's neighbors, it was obvious there was no reason to be concerned for Rapkin's well-being.

72. But the officers didn't leave, and none of them tried to end the ongoing constitutional violation.

73. Instead, the officers told Rapkin that they had to take her back to Zurfluh so she could "check on her."

74. Zurfluh immediately placed Rapkin under arrest, and the officers told Rapkin she was being arrested for assault, revealing their true motivation for going into Rapkin's home without a warrant.

75. Rapkin, shocked by the officers' warrantless arrest of her in her own home, tried to get answers about what was going on.

76. It's at this point Govani claims Rapkin attempted to strike him in the groin with her leg, which led to the officers roughly throwing Rapkin up against the wall and screaming in her face.

77. Then, while she was screaming in pain, the officers dragged Rapkin backward from her home, pausing to let a crowd gathered outside applaud her arrest.

78. Prior to dragging Rapkin out of her home, the officers swept the home, including the basement.

79. This meant they knew it was empty and that there was no contraband inside—not that there was any information ever suggesting there might be contraband anywhere.

80. Despite this, Kudrynskyy, Liebenthal, and Smith reentered Rapkin's home to search it again.

81. Smith entered Rapkin's bedroom, and after seeing an empty glass on the nightstand, exclaimed there was alcohol in the bedroom.

82. Kudrynskyy entered the bedroom and took a sniff of the glass, concluding that it smelled only like a soda.

83. Smith agreed that he did not actually see alcohol, but said that it must have been soda mixed with alcohol due to the "type of glass."

84. Smith also entered the bathroom and counted each pill in Rapkin's medical cabinet.

85. The medicine that Smith counted piece by piece was not sleeping medication, but was instead oral chemotherapy that had been prescribed for Rapkin's breast cancer.

86. Smith concluded that there was no evidence Rapkin had abused any medication.

87. Smith and Kudrynskyy reported this to Liebenthal, who voiced his frustration that the two had come up empty-handed when asked to find evidence to justify the warrantless home entry.

88. As a direct and proximate result of the acts of Defendants, as detailed above, Plaintiff suffered, *inter alia,* bodily injury, pain, suffering, mental distress, humiliation, loss of liberty, and loss of reputation, and has incurred expenses to repair the damage done to her home.

89. Rapkin filed a motion to suppress the evidence the officers gathered from the illegal search of her home.

90. The Honorable Laura Crivello granted the motion and found that the Defendants violated the Fourth Amendment because "a reasonable officer would have . . . come to the conclusion that either you need to get a warrant or wait till her attorney brings her down to the station house to talk. Period."

91. In the circuit court's view "law enforcement actions [of] kicking down her door violated the Fourth amendment" and "anyone would be hard-pressed to argue seriously differently."

92. Judge Crivello ultimately concluded that the "outrageous, police conduct" of the Defendants warranted suppression of the officers' body-worn camera footage because the "Fourth Amendment has to mean something. It can't be hollow."

## COUNT I:
## 42 U.S.C. § 1983 Claim for Initial Unlawful Entry/Failure to Intervene

93. Plaintiff realleges the above paragraphs.

94. The actions of Defendants Mueller, Kudrynskyy, Liebenthal, Govani, Smith, Wolber, and Zurfluh of entering Plaintiff's home and searching it without a warrant, and without any other permissible lawful reason to do so, violated Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure and thus violated 42 U.S.C. § 1983.

95. The Defendants each had an independent duty to stop their fellow officers from entering and/or remaining in Plaintiff's home without justification.

96. Mueller, Kudrynskyy, Liebenthal, Govani, Wolber, Smith, Nimmer, and Zurfluh failed to intervene to stop the violation, despite having ample opportunity to do so.

97. The aforementioned actions of Defendants Mueller, Kudrynskyy, Liebenthal, Govani, Smith, Wolber, Nimmer, and Zurfluh were the direct and proximate cause of the constitutional violations set forth above and of Plaintiff's injuries and damages set forth above.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendants Mueller, Kudrynskyy, Liebenthal, Govani, Smith, Wolber, Nimmer, and Zurfluh and because they acted maliciously, wantonly, or oppressively, punitive damages; the costs of this action, attorneys' fees; and such other and further relief that the Court deems just and equitable. Additionally, Plaintiff asks this Court to find that the Villages of Shorewood and Whitefish Bay are liable to defend this action against the defendants they employed and that the Villages are required to satisfy any judgment against their employees, by virtue of Wis. Stat. § 895.46.

## COUNT II:
## 42 U.S.C. § 1983 Claim for Unlawful Seizure and Arrest

98. Plaintiff realleges the above paragraphs.

99. The actions of Defendants Mueller, Kudrynskyy, Wolber, Liebenthal, Govani, Smith, and Zurfluh of seizing and arresting Plaintiff in her home without a warrant or other permissible legal justification, violated Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure and thus violated 42. U.S.C. § 1983.

100. The Defendants each had an independent duty to stop their fellow officers from arresting Plaintiff in her home without a warrant or other legal justification.

101. Mueller, Kudrynskyy, Liebenthal, Govani, Wolber, Smith, Nimmer, and Zurfluh failed to intervene to stop the violation, despite having ample opportunity to do so.

102. The aforementioned actions of Defendants Mueller, Kudrynskyy, Liebenthal, Govani, Smith, Wolber, Nimmer, and Zurfluh were the direct and proximate cause of the constitutional violations set forth above and of Plaintiff's injuries and damages set forth above.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendants Mueller, Kudrynskyy, Liebenthal, Govani, Smith, Wolber, Nimmer, and Zurfluh and because they acted maliciously, wantonly, or oppressively, punitive damages; the costs of this action, attorneys' fees; and such other and further relief that the Court deems just and equitable. Additionally, Plaintiff asks this Court to find that the Villages of Shorewood and Whitefish Bay are liable to defend

this action against the defendants they employed and that the Villages are required to satisfy any judgment against their employees, by virtue of Wis. Stat. § 895.46.

## COUNT III
## 42 U.S.C. § 1983 Claim for Second Unlawful Entry/Failure to Intervene

103. Plaintiff realleges the above paragraphs.

104. The actions of Defendants Kudrynskyy, Smith, and Liebenthal of entering Plaintiff's home for a second time, after she had been removed, to conduct a warrantless search without legal justification for doing so violated Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure and thus violated 42. U.S.C. § 1983.

105. The Defendants each had an independent duty to stop their fellow officers from entering and/or remaining in Plaintiff's home without justification.

106. Mueller, Kudrynskyy, Liebenthal, Wolber, Govani, Smith, and Zurfluh failed to intervene to stop the violation, despite having ample opportunity to do so.

107. The aforementioned actions of Defendants Mueller, Kudrynskyy, Liebenthal, Govani, Smith, Wolber, and Zurfluh were the direct and proximate cause of the constitutional violations set forth above and of Plaintiff's injuries and damages set forth above.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendants Mueller, Kudrynskyy, Liebenthal, Govani, Smith, Wolber, and Zurfluh and because they acted maliciously, wantonly, or oppressively, punitive damages; the costs of this action, attorneys' fees; and such other and further relief that the Court deems just and equitable. Additionally, Plaintiff asks this Court to find that the Villages of Shorewood and Whitefish Bay are liable to defend

this action against the defendants' they employed and that the Villages are required to satisfy any judgment against their employees, by virtue of Wis. Stat. § 895.46.

## COUNT IV
### 42 U.S.C. § 1983 Claim for Conspiracy

108. Plaintiff realleges the above paragraphs.

109. Defendants Mueller, Kudrynskyy, Liebenthal, Govani, Smith, Wolber, Nimmer, and Zurfluh reached an understanding and agreement to illegally enter Rapkin's home, illegally arrest her, and then illegally search her home in violation of her constitutional rights.

110. Defendants Mueller, Kudrynskyy, Liebenthal, Govani, Smith, Wolber, Nimmer, and Zurfluh each willfully engaged in overt acts in furtherance of their understanding to violate Rapkin's rights under the Fourth Amendment to be free from unreasonable searches, arrests, and seizures.

111. The aforementioned actions of Defendants Mueller, Kudrynskyy, Liebenthal, Govani, Smith, Wolber, Nimmer, and Zurfluh were the direct and proximate cause of the constitutional violations set forth above and of Plaintiff's injuries and damages set forth above.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendants Mueller, Kudrynskyy, Liebenthal, Govani, Smith, Wolber, Nimmer, and Zurfluh and because they acted maliciously, wantonly, or oppressively, punitive damages; the costs of this action, attorneys' fees; and such other and further relief that the Court deems just and equitable. Additionally, Plaintiff asks this Court to find that the Villages of Shorewood and Whitefish Bay are liable to defend

this action against the defendants' they employed and that the Villages are required to satisfy any judgment against their employees, by virtue of Wis. Stat. § 895.46.

## COUNT V
## 42 U.S.C. § 1983 *Monell* Policy Claim
## (Village of Shorewood)

112. Plaintiff realleges the above paragraphs.

113. The above alleged actions of Defendants Mueller, Kudrynskyy, Liebenthal, Govani, Nimmer, Wolber, and Smith were done pursuant to one or more interrelated policies, practices, and/or customs of the Defendant Village of Shorewood, its Police Department, and its Police Chief.

114. At all times material to this complaint, Defendant Village of Shorewood, its Police Department, and/or its Police Chief had interrelated de facto policies, practices, and customs to enter private residences without a search warrant under the false guise of the community caretaker doctrine.

115. In addition, Defendant Nimmer, the Chief of Police and head policy maker for police actions in the Village of Shorewood directly participated in the conspiracy to violate Rapkin's constitutional rights.

116. Defendant Nimmer was aware of the situation at Rapkin's home and failed to intervene to stop his subordinates from violating Rapkin's constitutional rights.

117. The policies, practices, customs, and direct involvement of chief policymaker Nimmer encouraged the above police misconduct and were separately and together, the moving force and a direct and proximate cause of the unconstitutional acts committed by

17
Case 2:23-cv-00670-NJ    Filed 05/31/23    Page 17 of 18    Document 1

Mueller, Kudrynskyy, Liebenthal, Govani, Smith, and Wolber as well as the injuries and damages sustained by Plaintiff.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendant Village of Shorewood plus the costs of this action, attorney's fees, and such other and further relief that the Court deems just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury, pursuant to FED. R. CIV. PRO. 38(b), on all issues so triable.

Respectfully submitted,

Dated: May 31, 2023.

STRANG BRADLEY, LLC
Attorneys for Plaintiff

/s/ James Odell
John H. Bradley
  Wisconsin Bar No. 1053124
R. Rick Resch
  Wisconsin Bar No. 1117722
James Odell
  Wisconsin Bar No. 1131587
Strang Bradley, LLC
613 Williamson St., Suite 204
Madison, WI 53703
(608) 535-1550
John@StrangBradley.com
Rick@StrangBradley.com
James@StrangBradley.com